BLUE, J.
 

 This case involves the taxation of the familiar packets of advertisements and coupons that arrive at our homes in the mail. The facts have been stipulated.
 

 Val-Pak of Central Connecticut North, Inc. (Val-Pak), the plaintiff in this tax appeal, is a Connecticut corporation engaged in the business of selling what are technically called cooperative direct mail advertising services. This is a method whereby a number of different businesses arrange to have their advertisements and coupons mailed in a common envelope to homes in a particular geographic area. A representative envelope and its representative contents are in evidence. The contents are a familiar assortment of coupons (offering, for example, a free pizza with a purchase of another pizza) and flyers (promoting, for example, Sears Vinyl Siding).
 

 During the taxable years in question, Val-Pak was either a licensee or a sublicensee of Val-Pak Direct Marketing Systems, Inc. (Direct Marketing), a Florida corporation located in St. Petersburg, Florida. Val-Pak
 
 *136
 
 approached businesses in its assigned territory and offered to advertise their services by cooperative direct mailing. It would often suggest the contents of advertising material. If a business agreed to use Val-Pak’s services, Val-Pak would then place an order with Direct Marketing to print and mail advertising material for the subscribing business.
 

 All advertising materials were printed in Florida. Direct Marketing would sort and place the advertising materials in envelopes and send them by third class United States mail from St. Petersburg, Florida, directly to the homes in Val-Pak’s assigned territory.
 

 Direct Marketing billed Val-Pak directly for the services it performed, itemizing charges for such services as printing, envelope addressing, sorting and postage. Val-Pak billed the subscribing businesses directly for the services it performed. Val-Pak’s bills were not itemized.
 

 This case concerns the taxability of Val-Pak’s activities by the state of Connecticut for the years 1984-1989. The history of the relevant statutory law and of the varying treatment of Val-Pak’s activities by the department of revenue services (department) is of considerable interest.
 

 Connecticut has had both a sales tax and a use tax since 1947. The sales tax is imposed on “sales” as defined in General Statutes § 12-407 (2). See General Statutes § 12-408 (1). In Connecticut, as in most states, the sales tax is imposed on all sales of tangible personal property, with some exclusions, but only on specified services. See
 
 Smedley Crane Service, Inc.
 
 v.
 
 Crystal,
 
 43 Conn. Sup. 5, 7, 636 A.2d 885 (1993); 2 J. Hellerstein & W. Hellerstein, State Taxation (1992) If 12.05. Prior to July 1, 1989, the portion of the statutory definition of
 
 *137
 
 “sale” that itemizes taxable services, § 12-407 (2) (i), did not include any service comparable to the services performed by Val-Pak.
 

 To complement the sales tax, an excise tax, denominated a use tax, is imposed “on the storage, acceptance, consumption or any other use in this state of tangible personal property purchased from any retailer for storage, acceptance, consumption or any other use in this state, [or] the acceptance or receipt of any services constituting a sale . . . .” General Statutes § 12-411 (1). “Use” is defined as including “the exercise of any right or power over tangible personal property incident to the ownership of that property.” General Statutes § 12-407 (5).
 

 Section 12-407 (2) (i) has undergone two changes of importance to this case in recent years. In 1989, it was amended to include “advertising or public relations services, including layout, art direction, graphic design, mechanical preparation or production supervision, not related to the development of media advertising.” Public Acts 1989, No. 89-251, § 1 (P.A. 89-251). This amendment took effect July 1,1989. P.A. 89-251, § 203. In 1991, the exemption for the development of media advertising was expanded to exclude additionally “cooperative direct mail advertising . . . .” Public Acts, Spec. Sess., June, 1991, No. 91-3, § 103. This amendment took effect October 1, 1991. Public Acts, Spec. Sess., June, 1991, No. 91-3, § 168.
 

 On July 1,1989, when the 1989 amendment went into effect, Val-Pak began collecting sales tax on its charges to subscribing businesses. Because of this fact, the department does not claim any deficiency for transactions occurring after that date even though the period July 1, 1989, to December 31, 1989, is within the formal audit period.
 

 
 *138
 
 On March 6, 1990 — after the 1989 amendment but before the 1991 amendment — the department issued a ruling in response to a request submitted by another Direct Marketing licensee doing business in Connecticut. This ruling is printed as Ruling 90-30, 2 CCH Conn. Tax Rptr. (1990) 360-330. The business conducted by the taxpayer in question was, for all practical purposes, the same as that conducted by Val-Pak. The department ruled: “The taxpayer’s participation in a cooperative direct mailing of advertising material to Connecticut households is an advertising service.” Id. It further ruled that this service was not related to the development of media advertising. The department then turned to the question of identifying the taxable activity in question. It reasoned: “It is the benefit of the advertising services and not the performance of those services that is the subject of taxation.” Id. It concluded: “The charges by the taxpayer . . . related to the advice, development, creation and/or dissemination of advertising material to Connecticut households is properly subject to Connecticut sales and use tax.” Id.
 

 In April, 1990, the department audited Val-Pak. The audit years, as already mentioned, were the calendar years 1984-1989. Val-Pak’s activity remained the same throughout this period. The auditor, however, characterized this unvarying activity in two different ways, depending on whether it occurred prior to July 1, 1989, or on and after that date. For the period prior to July 1,1989, the auditor concluded that Val-Pak was a seller of tangible personal property. The tangible personal property deemed to be sold was the advertising material mailed by Direct Marketing. For the period commencing July 1, 1989, the auditor concluded that Val-Pak was a seller of advertising services. As already mentioned, no deficiency was assessed for this latter period because Val-Pak began collecting sales tax on its services on July 1, 1989.
 

 
 *139
 
 Val-Pak petitioned for a reassessment, pursuant to General Statutes § 12-418. On March 2, 1993, after a hearing, the appellate division of the department issued a formal memorandum. The memorandum acknowledges Ruling 90-30, discussed previously. In view of that ruling, the appellate division recommended “recharacterizing the taxpayer as an advertising service provider for periods prior to July 1, 1989.”
 

 But what exactly was it that was being taxed? Having just characterized Val-Pak as a provider of services, the appellate division went on to say that “under [this] scenario ... it is the consumer of printed material which is prepared and mailed by . . . Direct Marketing ... to Connecticut households.” Val-Pak, the appellate division opined, “clearly has title to the materials when they enter the state for dissemination.” The department thus concluded that Val-Pak made a taxable use of the advertising materials and should have paid a use tax on that use. The amount of the tax assessed was calculated on the basis of the printing costs in Direct Marketing’s bills to Val-Pak. The appeal to this court followed.
 

 Although the amount of the tax assessment is clear, there is a basic confusion as to what exactly it is that is being taxed here that lies at the heart of this case. In order to appreciate this, it is helpful to break down the chain of events being considered into individual transactions involving a hypothetical business, which I shall call Paul’s Pizza, and a hypothetical potential recipient of mail, who I shall call Harry Homeowner. I have arbitrarily assigned economic figures to the transaction that will give profits to both Val-Pak and Direct Marketing. With this in mind, the chain of events is as follows:
 

 Step 1
 

 Paul’s Pizza agrees to use Val-Pak’s services. Val-Pak bills Paul’s Pizza $120 for its services.
 

 
 *140
 
 Step 2
 

 Val-Pak places an order with Direct Marketing. Direct Marketing bills Val-Pak $100 for Direct Marketing’s services, of which $40 is attributable to printing costs.
 

 Step 3
 

 Direct Marketing mails an envelope of coupons to Harry Homeowner. Direct Marketing spends $40 to print the coupons and another $40 to mail them, for a total cost of $80. Harry Homeowner pays Direct Marketing nothing.
 

 Schematically, these steps can be portrayed as follows. The flow of services is represented by an unbroken line of arrows. The flow of dollars is represented by arrows alternating with $ signs. The flow of coupons is represented by a line of solid triangles.
 

 [[Image here]]
 

 With this description in mind, it should be remembered that the initial judicial task is to identify what it is that is being taxed here. Ruling 90-30, described above, squarely taxes Step 1. Step 1 is a service, and the tax on that service would be calculated on a charge of $120. It is clear, however, that Step 1 is not being taxed here. The
 
 amount
 
 of the tax actually levied was calculated not on the basis of Val-Pak’s bills to its subscribing businesses but on the basis of the printing costs itemized in Direct Marketing’s bills to Val-Pak. In my example, the amount taxed would be $40.
 

 
 *141
 
 At this point, we come to what the New Yorker sometimes refers to as the Department of Utter Confusion. Even though Step 2 provides the
 
 amount
 
 that is being taxed, it is not precisely this
 
 step
 
 that is being taxed. Indeed, it could not be precisely this step that is being taxed because Step 2, like Step 1, is a service, and prior to July 1, 1989, § 12-407 (2) did not define “sale” as including this type of service.
 

 The memorandum of the appellate division exemplifies the confusion at the heart of this case. The memorandum initially implies that it is following the analysis of Ruling 90-30. Ruling 90-30, however, taxed Step 1, and it has already been established that that is not what is happening here. The memorandum then characterizes Val-Pak as “an advertising service provider.” But, as just explained, the state of the law prior to July 1, 1989, did not allow taxation of advertising services.
 

 This is where, much as in a three-card monte game on 42nd Street, things are switched around in the blink of an eye. In the very same sentence that the appellate division states that Val-Pak is “an advertising service provider” it declares that Val-Pak “is the consumer of printed material which is prepared and mailed by . . . Direct Marketing ... to Connecticut households.” But wait! The “advertising service” and the “printed material” are two different things. The “advertising service” is the bundle of services that Val-Pak provides to its subscribing businesses, including advice on the content of the coupons and arranging with Direct Marketing to have the coupons printed, sorted and mailed. The “printed material” is the coupons themselves. Moreover, at least for state tax purposes, the “advertising service” and the “printed material” are two very different
 
 kinds
 
 of things. The “advertising service” is a service. The “printed material,” in contrast, is tangible personal property.
 

 
 *142
 
 In addition, at least as far as the “printed material” is concerned, there is a very real question as to just how the tax on this “material” should be calculated. General Statutes § 12-411 (1) imposes a use tax “at the rate of six per cent of the
 
 sales price
 
 of the property or the consideration paid for [taxable] services . . . .” (Emphasis added.) “Sales price” is defined as “the total amount for which tangible personal property is sold . . . .” General Statutes § 12-407(8). Thus, if a Connecticut consumer purchases from an out-of-state retailer for $10 an item actually worth $100 the use tax is calculated on the basis of the sales price ($10) rather than the actual value of the item ($100).
 

 In the example just given, the definition of “sales price” seems straightforward enough. But what about the Val-Pak scenario? What is the “sales price” of the coupons here? The most natural conclusion is that the sales price is zero. Harry Homeowner pays Direct Marketing nothing for the coupons. If he should be so fortunate as to sell them on the open market, his basis in them will be zero. Eventually, if the coupons (and the pizza) are sufficiently tempting, Harry will spend enough money at Paul’s Pizza that the money that Paul’s Pizza paid to Val-Pak will be repaid, but he can hardly be said to purchase the coupons from Paul’s Pizza. (Indeed, he is just as likely to throw the coupons away and never dine at Paul’s Pizza at all.)
 

 As best as I can understand it, the reasoning of the department is as follows. Direct Marketing is not like John Beresford Tipton in
 
 The Millionaire. (The Millionaire,
 
 it might be recalled, was a television program broadcast before the modern era of state lotteries in which a wealthy philanthropist, John Beresford Tipton, would each week give one million dollars to a total stranger and watch to see what was done with the money.)
 
 Someone
 
 pays for the coupons. Direct Marketing gets its money from Val-Pak. Therefore, Val-Pak
 
 *143
 
 purchases the coupons. The price that Val-Pak pays for the coupons is the sum of money that Val-Pak pays to Direct Marketing for printing them — in my example $40.
 

 This analysis has the attractiveness of a syllogism and the additional virtue of explaining why the tax in my example has been calculated on the sum of $40. It is, however, a totally unreal way of describing what is going on. Whatever else it is doing, Val-Pak is not purchasing the coupons. It does not even want the coupons. It is certainly not purchasing the coupons as a gift to Harry Homeowner in the way that one might purchase a gift of flowers from a florist for a sick relative. Instead, Val-Pak is purchasing a
 
 service.
 
 The service that it is purchasing is the printing (as well as the sorting and mailing) of coupons by Direct Marketing. In doing so, Val-Pak is also providing a service. The service that it is providing is a service to Paul’s Pizza. This is the view taken by Ruling 90-30, and it is an analysis that at the end of the day I find correct. The soundness of this analysis is underscored by the fact that the legislature, in passing Public Acts, Spec. Sess., June, 1991, No. 91-3, § 103, plainly found “cooperative direct mail advertising” to be a kind of service. Under this analysis Val-Pak owes no tax because the service it provides was not taxable prior to July 1, 1989.
 

 There is one final way of looking at this transaction, suggested at argument by the department. I shall term it a fallback argument, although it is not clear that it was presented as such. Under this fallback argument, Direct Marketing and, by extension, Val-Pak provide to their customers a
 
 mixture
 
 of tangible personal property (i.e., the coupons) and services. At first blush, this argument has some promise. Given the evidence in this case, however, the department has not established that ValPak has used the coupons here even if the fallback argument is conceptually correct.
 

 
 *144
 
 The use tax cannot be imposed unless there is a “storage, acceptance, consumption or any other use in this state . . . .” General Statutes § 12-411 (1). The “storage, acceptance, consumption or any other use in this state” must be done by the taxpayer. General Statutes § 12-411 (2). “Use,” as already mentioned, is defined as “the exercise of any right or power over tangible personal property
 
 incident to the ownership of that property
 
 . . . .” (Emphasis added.) General Statutes § 12-407 (5). Our Supreme Court has long held that “storage and consumption, as well as use, must be incident to ownership for the use tax to apply.”
 
 Avco Mfg. Corp.
 
 v. Connelly, 145 Conn. 161, 173, 140 A.2d 479 (1958). The statutory requirement of “ownership” is a distinctive feature of Connecticut law that is not present in states like New Jersey that have imposed use tax liability on businesses that are arguably analogous to Val-Pak. Compare, e.g., N.J. Rev. Stat. § 54:32B-2h (defining “use” as simply “[t]he exercise of any right or power over tangible personal property by the purchaser thereof’), as construed in
 
 Comfortably Yours, Inc.
 
 v.
 
 Director,
 
 272 N.J. Super. 543, 640 A.2d 862 (1994). If the fallback argument of the department is to succeed, it must first be established that Val-Pak “owned” the coupons that the department seeks to tax.
 

 “The word ‘owner’ is found in numerous statutes and has no commonly approved usage or fixed meaning, ‘but must be interpreted in its context and according to the circumstances in which it is used.’
 
 Warren
 
 v.
 
 Borawski,
 
 130 Conn. 676, 679, 37 A.2d 364 [(1944)] . . . .” (Citations omitted.)
 
 Hope
 
 v.
 
 Cavadlo,
 
 163 Conn. 576, 580, 316 A.2d 407 (1972). At argument, the department conceded that “ownership” in the context of § 12-407 (5) means the holding of title. Cf.
 
 Warner
 
 v.
 
 Leslie-Elliott Constructors, Inc.,
 
 194 Conn. 129, 137, 479 A.2d 231 (1984) (construing “owner” in context of real property statutes by reference to title).
 

 
 *145
 
 Val-Pak at no time had title to the coupons here. Those coupons were initially owned by Direct Marketing and, upon delivery, were owned by the recipients.
 
 SFA Folio Collections, Inc.
 
 v.
 
 Bannon,
 
 217 Conn. 220, 228, 585 A.2d 666, cert. denied, 501 U.S. 1223, 111 S. Ct. 2839, 115 L. Ed. 2d 1008 (1991). Direct Marketing arguably continued to own the coupons while they were in the custody of the United States mail because the Domestic Mail Manual of the United States Postal Service gives senders of mail the right to recall it. It is, however, unnecessary to distinguish between the property rights of senders and recipients here because ValPak was neither sender nor recipient.
 

 The department argues that Val-Pak can be found to be the “owner” of the coupons prior to delivery because Direct Marketing was its agent. “The law is clear that the burden of proving agency is on the party asserting its existence.”
 
 Robert T. Reynolds Associates, Inc.
 
 v.
 
 Asbeck,
 
 23 Conn. App. 247, 251, 580 A.2d 533 (1990). The department has simply not met its burden of proof here. There is, of course, a strong nexus between ValPak and Direct Marketing, but the evidence does not show that the particular agency relationship asserted to exist in fact existed. This is not a case like
 
 D. H. Holmes Co., Ltd.
 
 v.
 
 McNamara,
 
 486 U.S. 24, 108 S. Ct. 1619, 100 L. Ed. 2d 21 (1988), where a large chain of department stores contracted with out-of-state printers to print and mail its catalogs. In that case, it was clear that the Holmes Company was the principal and the printer was its agent. The evidence of agency is much less compelling in this case.
 

 One of the elements required to show the existence of an agency relationship is “an understanding between the parties that the principal will be in control of the undertaking.”
 
 Botticello
 
 v.
 
 Stefanovicz,
 
 177 Conn. 22, 25, 411 A.2d 16 (1979). The undertaking in question here is the printing and mailing of coupons. There is no
 
 *146
 
 evidence of an understanding that Val-Pak was to be in control of this undertaking. Val-Pak may have had a certain degree of control over the
 
 content
 
 of the coupons, but this does not necessarily imply that it had
 
 title
 
 to the coupons. There is no evidence of any understanding that Val-Pak had any right to assert title to the coupons or to recall them from the mail. If Val-Pak had discovered, for instance, a misprint in a coupon and had asked Direct Marketing to recall the coupons it had mailed, I can only speculate as to whether Direct Marketing would have done so. Recall is an expensive proposition, since there must be a formal application and the expenses of recall are chargeable to the mailer.
 
 Hoffman-La Roche, Inc.
 
 v.
 
 Porterfield,
 
 16 Ohio St. 158, 162, 243 N.E.2d 72 (1968). There is no evidence that Direct Marketing would be obliged to undertake this procedure at Val-Pak’s request. Direct Marketing appears to be a considerably larger enterprise than ValPak, and Val-Pak was merely its licensee or sublicensee. If anything, the evidence in this case suggests that Direct Marketing was the principal and Val-Pak was the agent rather than the other way around. For this reason, the department has not established the factual predicate for its agency theory.
 

 Under these circumstances, Val-Pak cannot be said to have “used” the coupons in question. As already discussed, the services that it unquestionably provided were not taxable prior to July 1,1989. Neither the principal nor the fallback arguments of the department can be sustained. Judgment therefore must be rendered for the plaintiff.