STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. ISIAH MACON, DEFENDANT-APPELLANT.

Argued November 9, 1970—Decided January 25, 1971.

*Mr. David I. Stepacoff* argued the cause for appellant (*Messrs. Stepacoff, Koch and Kroop,* attorneys).

*Mr. Peter J. Schwartz,* Assistant Prosecutor, argued the cause for respondent (*Mr. Edward J. Dolan,* Middlesex County Prosecutor, attorney).

The opinion of the Court was delivered by

WEINTRAUB, C. J. On an indictment for murder, defendant was convicted of manslaughter and sentenced to a term of seven to ten years. The Appellate Division affirmed. De-

fendant then appealed to us, raising two questions. One is whether the Appellate Division used an unconstitutional standard of review in dealing with a claim of error. The other question is whether the sentence was excessive.

I

In the early morning of May 30, 1968 defendant was involved in a minor collision with a vehicle operated by one Abrahms. While defendant and Abrahms were debating whether there was damage to defendant's car, the deceased, a friend of Abrahms, came to the scene and entered the discussion in support of Abrahms. It seems clear that the deceased had had too much to drink. Defendant, too, had been drinking, but he did not contend he was under the influence of liquor. The State's proof was that when the deceased placed his hand in a friendly way upon defendant's shoulder, defendant stepped back, drew a gun and fired two shots into decedent; that friends of the deceased jumped upon defendant to subdue him; that some additional shots were fired aimlessly in the struggle. On the other hand, defendant testified that as he tried to leave to telephone the police with respect to the collision, the deceased suddenly punched him in the chest; that defendant, backing away, drew the weapon to frighten the deceased; that someone grabbed defendant from behind, causing the gun to be fired; that as the men grappled, the gun was discharged several more times. In short, defendant denied that he pulled the trigger and insisted the firing was caused by the physical activity of others.

When the deceased collapsed, his friends turned to attend him. Thereupon, defendant and his two companions drove off. Defendant said he drove aimlessly; that he threw the gun away during the ride; that he abandoned the car at a place he could not recall; that later that morning his wife told him the police were outside their home; that he then telephoned his lawyer.

In his summation the prosecutor said:

"Then what does he do? He drives along and can't tell us where. The gun goes out the car window. An act of innocence?

The car is left somewhere and he doesn't remember where. An act of innocence?

He goes home and takes his clothes off and puts the shirt down in the chest, a torn shirt. Then he goes to bed. He says he had trouble sleeping. He gets up the next morning and lo and behold what does he do? *He calls his lawyer. These are the various acts of innocence?*" (Emphasis is ours.)

There was no objection to this argument, but on appeal to the Appellate Division, defendant contended for the first time that the sentences we have italicized constituted an infringement of defendant's Sixth Amendment right to counsel. The Appellate Division answered:

"We agree with defendant that the prosecutor's allusion to defendant's calling his lawyer the morning following the fatal affray was improper. However, it was not objected to at trial, and in the context of the summation in its entirety and the facts of the case, we fail to find plain error."

Defendant now contends the Appellate Division was bound to apply the standard for reversal with respect to "constitutional" errors established in *Chapman v. California,* 386 *U. S.* 18, 87 *S. Ct.* 824, 17 *L. Ed.* 2d 705 (1967). Instead, defendant says, the Appellate Division must have employed the definition of plain error in *State v. Corby,* 28 *N. J.* 106 (1958), which, defendant says, is less favorable. More specifically, *Chapman,* as we will later develop more fully, says that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt," 386 *U. S.* at 24, 87 *S. Ct.* at 828, 17 *L. Ed.* 2d at 710–711, whereas *Corby* defined "plain error" as one possessing "a clear capacity to bring about an unjust result." 28 *N. J.* at 108. These standards, defendant says, would lead to opposite dispositions of his appeal.

Defendant's argument thus starts with the hypotheses that the prosecutor's comment must have been understood by the jury to zero in upon defendant's telephone call to his attorney and to mean that seeking legal advice itself evidenced a consciousness of guilt, and that an argument in that vein violates the constitutional right to counsel. From there defendant goes to the proposition that *Chapman* requires its test to be applied notwithstanding defendant's failure to object at the trial as required by our State practice, and finally that the *Corby* formula and the *Chapman* formula are decisively different.

As to the first premise, it is far from clear that the prosecutor intended the thrust defendant now finds. The jury could have understood that in attacking defendant's claim of total innocence the prosecutor was arguing that defendant's behavior revealed a purpose to conceal his identity and thus to evidence a consciousness of guilt. So the prosecutor referred to defendant's leaving the scene, throwing the gun away, and abandoning the car at some unknown place. The reference to the telephone call to the attorney would have been consistent with that theme if the prosecutor had also mentioned the intervening fact, known to the jury, that defendant did not call his attorney until his wife had told him the police were outside their home, thus ending his hope that he had escaped detection.

Surely the prosecutor did not baldly assert that a man involved in a shooting would not call his attorney unless he felt he was guilty. That proposition would be rather absurd and unpersuasive. Nonetheless defendant insists the prosecutor's argument should be so understood, and we agree that, literally, it could be.

But to invoke *Chapman*, defendant must elevate the "error" to constitutional level. To that end, defendant turns to the Sixth Amendment right to counsel and contends that it was infringed. We are aware of the tendency of the day to find constitutional moment in relatively routine matters, but we see no reason thus to embellish the question before

us. The Sixth Amendment right to counsel did not exist at the time of the telephone call, for the guarantee does not apply prior to arrest. *Hoffa v. United States,* 385 *U. S.* 293, 309–310, 87 *S. Ct.* 408, 17 *L. Ed.* 2d 374, 386 (1966). And of course defendant was not denied counsel, which is what the Sixth Amendment assures. We do not suggest that consciousness of guilt may be reasonably inferred from the fact that counsel was sought at any time. Rather our point is that the comment of the prosecutor did not trench upon the right secured by the Sixth Amendment in any direct or immediate sense.

*Chapman* involved a very different picture. That case was tried before *Griffin v. California,* 380 *U. S.* 609, 85 *S. Ct.* 1229, 14 *L. Ed.* 2d 106 (1965), and both the prosecutor and the trial court, in the words of *Chapman,* 386 *U. S.* at 25, 87 *S. Ct.* at 829, 17 *L. Ed.* 2d at 711, "continuously and repeatedly impressed the jury that from the failure of petitioners to testify, to all intents and purposes, the inferences from the facts in evidence had to be drawn in favor of the State — in short, that by their silence petitioners had served as irrefutable witnesses against themselves." Thus the comment in *Chapman* operated to deny the very constitutional value the Fifth Amendment privilege, as construed in *Griffin,* was intended to secure. In the case at hand, we have, at most, a wayward argument in summation, which argument, if understood in the vein defendant urges, nonetheless did not deny to defendant the advice and assistance of counsel. And we add that, unlike *Chapman,* the trial court did not tell the jury the prosecutor's argument was rooted in legal principle.

Moreover, the comment involved in *Griffin* and *Chapman* had inherent persuasive force whereas the comment here involved had none at all. A defendant's silence, especially in the face of directly inculpatory proof, bears rationally against him in the fact-finding process, at least with respect to whether such uncontradicted evidence is believable. The Fifth Amendment was found to mandate the other way, but

the Amendment was found to do so to support a different value, alien to the ascertainment of the truth. Thus, the prosecutor's argument and the trial court's instructions in *Chapman* directly supported a fact-finding approach which was natural and quite irresistible in the absence of a cautionary instruction that the law forbade it.

But as to consulting counsel, it would be a rare man who would find in that circumstance anything beyond the bland fact of an awareness of involvement in a legal predicament. If prospective jurors were asked whether they would think it evidence of consciousness of guilt that a man involved in a shooting affair telephoned his lawyer, it would be surprising if any answered that he would. Indeed, it is not unusual for a defendant to attack a confession before a jury on the claim that his demand for counsel was ignored, and this is done without a fear that the jurors may think the call for counsel was itself incriminating. We have not found a reported instance in which the prosecutor sought to maintain that a man reveals a consciousness of guilt when he consults a lawyer. While there are reported cases in which the prosecution sought a hostile inference from the fact that a defendant said he would not talk until he had seen a lawyer, the prosecutor really sought to have the inference drawn from the defendant's failure or refusal to speak rather than from the reason he gave for his silence, *i. e.*, his wish to consult an attorney. See *State v. Ripa*, 45 *N. J.* 199 (1965); *Kelley v. United States*, 99 *U. S.* App. D. C. 13, 236 *F.* 2d 746, 749 (1956); *Fagundes v. United States*, 340 *F.* 2d 673, 676-677 (1 Cir. 1965); *Jones v. United States*, 111 *U. S. App. D. C.* 276, 296 *F.* 2d 398, 408 (1961), *cert.* denied, 370 *U. S.* 913, 82 *S. Ct.* 1260, 8 *L. Ed.* 2d 406 (1962); *People v. Hansard*, 245 *Cal. App.* 2d 691, 53 *Cal. Rptr.* 918, 922 (1966); *State v. Bowman*, 204 *Kan.* 234, 461 *P.* 2d 735 (Sup. Ct. 1969). We are satisfied a jury would not think a man reveals a feeling of guilt by telephoning his lawyer in the face of an impending arrest, and hence, unless every absurd argument which can be related in any way to a

constitutional right automatically raises an issue of constitutional gravity, the alleged error before us cannot be said to be of such basic substance.

 Nor, if it be granted that the error is of a constitutional quality, should it be assumed that *Chapman* applies to State appellate review where a claim of constitutional error was not raised before the trial court in accordance with established State practice. As we said above, there was no objection to the prosecutor's argument and no request for a disapproving instruction. A complaint was first lodged on appeal. It is fundamental in our practice that a claim of error which could have been but was not raised at trial will not be dealt with as would be a timely challenge. The reasons are several. It may be fair to infer from the failure to object below that in the context of the trial the error was actually of no moment. Further, to rerun a trial when the error could easily have been cured on request, would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal. In this regard, we do not deem it a palliative to explore testimonially the thoughts of trial counsel or his pertinent conversations with his now unhappy client. Our limited experience in that area suggests such inquiries demean the attorney-client relationship with no compensating gain. In any event, except in extraordinary circumstances, a claim of error will not be entertained unless it is perfectly clear that there actually was error. In other words, if upon a timely objection a different or further record might have been made at the trial level, and the claim of error might thereby have been dissipated, we will neither reverse on an assumption that there was error nor remand the matter to explore that possibility. So, for example, a claim, first made on appeal, that evidence was illegally seized will not be accepted if the record does not exclude the possibility that, had a timely objection been made to the evidence, the claim of illegality might have been met. These principles rest upon the belief that our practice offers every opportunity for a fair trial, and that unless there is some

order in the trial of cases, the State judiciary cannot hope to meet the swollen demands upon it.

The Federal Supreme Court has always recognized that a State has a substantial interest in requiring litigants to object timely so long as a fair opportunity is afforded to that end. *Henry v. Mississippi,* 379 *U. S.* 443, 452, 85 *S. Ct.* 564, 13 *L. Ed.* 2d 408, 415 (1965) ; *Douglas v. Alabama,* 380 *U. S.* 415, 85 *S. Ct.* 1074, 13 *L. Ed.* 2d 934 (1965) ; see *O'Connor v. Ohio,* 385 *U. S.* 92, 87 *S. Ct.* 252, 17 *L. Ed.* 2d 189 (1966). Hence even though the federal courts will permit a State defendant to raise constitutional issues for the first time in a federal proceeding, provided he did not deliberately bypass State procedures, *Fay v. Noia,* 372 *U. S.* 391, 83 *S. Ct.* 822, 9 *L. Ed.* 2d 837 (1963), yet *Henry* made it plain that the Federal Supreme Court did not wish "even remotely [to] imply that the State must forego insistence on its procedural requirements." 379 *U. S.* at 452, 85 *S. Ct.* at 570, 13 *L. Ed.* 2d at 415. Nothing in *Chapman* intimates a departure from *Henry.* In short, although *Chapman* is controlling in a State court review of a timely claim of error, it does not curtail the authority of the State court to decide whether or how to deal with a claim of error which was not timely. We have since *Chapman* continued to apply our approach to belated assertions of constitutional errors. *State v. DiRienzo,* 53 *N. J.* 360, 384 (1969) ; *State v. Broxton,* 49 *N. J.* 373, 388 (1967). For State cases elsewhere which since *Chapman* have also required a timely objection at the trial, see *People v. Armstrong,* 268 *Cal. App.* 2d 324, 74 *Cal. Rptr.* 37, 38 (1968) ; *Robbins v. State,* 242 *N. E.* 2d 925 (Ind. Sup. Ct. 1969) ; *Thompson v. State,* 6 *Md. App.* 50, 250 *A.* 2d 304, 307 (Ct. App. 1969) ; *State v. Cannon,* 185 *Neb.* 149, 174 *N. W.* 2d 181, 184 (Sup. Ct. 1970). Indeed, as to federal trials, some federal cases since *Chapman* appear to deal as we do with a belated claim of error. See *People of Territory of Guam v. Cruz,* 415 *F.* 2d 336, 338 (9 Cir. 1969) ; *Marshall v. United States,* 409 *F.* 2d 925 (9 Cir. 1969) ; *United States v. Baratta,* 397 *F.* 2d 215, 227 (2 Cir.

1968); *cert.* denied, 393 *U. S.* 939, 89 *S. Ct.* 293, 21 *L. Ed.* 2d 276 (1968); *Mims v. United States,* 375 *F.* 2d 135 (5 Cir. 1967).

In the present case, we cannot be sure whether the Appellate Division merely declined in its discretion to consider the belated complaint, or whether it accepted the complaint and applied *Chapman's* test of reversibility rather than, as defendant argues before us, the supposedly less favorable test expressed in *Corby.* In any event, we would see no basis for a new trial even if the language of *Chapman* were invoked. In the words of *Chapman,* we are satisfied beyond a reasonable doubt that the prosecutor's comment, however understood, was thoroughly harmless. As we have said, the point defendant attributes to the prosecutor was indeed pointless and a juror would readily understand this to be so. Nor does the result of the trial even faintly suggest harm. Defendant fared as well as he could have hoped. The physical facts compelled a finding that the shooting was intentional rather than the product of a third person's physical intervention, and there being no basis for a claim of self-defense, the jury gave defendant the best possible view of the case when it found that he was provoked and hence that his offense was no greater than manslaughter.

We must add that we are not at all sure the test in *Chapman* is discernibly different from our measure for reversible error, despite the differences in phrasing. The statement of any formula is more likely to summarize the result than to assist in reaching it, for a reviewing judge exercises a delicate discretion which cannot be contained by any set of words. *Kolteakos v. United States,* 328 *U. S.* 750, 759–761, 66 *S. Ct.* 1239, 90 *L. Ed.* 1557, 1563–1564 (1946).

No matter how a test may be stated, the question whether an error is reason for reversal depends finally upon some degree of possibility that it led to an unjust verdict. We say "possibility" and not "certainty," for if it were certain that the error led to an unjust result, the reviewing court would be constrained to order the just result, which,

on that hypothesis, would be an acquittal, except in the unusual case in which it could be said the error prevented the trier of facts from even reaching the merits. So, too, a "probability" that the error resulted in a false verdict should, if it were the standard for intervention, drive the appellate court to order the judgment which the jury "probably" would have reached but for that error. And since a reviewing court could rarely say an error either certainly or probably induced a false verdict, either test would disadvantage a defendant. Defendants fare better if a new trial may be ordered upon a "possibility" of injustice. Still, not "any" possibility can be enough for a rerun of the trial. The possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.

The common law supposedly called for a reversal for any error. That rule, however, was rejected long ago by statutes which introduced the concept of harmless error. So in our State, a statute adopted in 1855 (*c.* 226, *p.* 648) prohibited reversal for error "except such as shall or may have prejudiced the defendant in maintaining his defence on the merits." See *Clifford v. State,* 61 *N. J. L.* 217 (E. & A. 1897). That formula of course involved some unspecified degree of possibility of injury. A statute in 1894 (*c.* 163, *p.* 246) authorized a review upon the entire record, as opposed to the strict bill of exceptions of the common law practice, and directed a new trial "if it appear from such record that the plaintiff in error on the trial below suffered manifest wrong or injury." The statute did not, however, define "manifest wrong or injury," and those words were never construed to require a finding that the error led, or probably led, to a false verdict. Rather, the reviewing court continued to look for an unstated degree of possibility of such injury, but did so, as the statute required, upon the whole record rather than the portion of the record contained in the ancient bill of exceptions.

We continued the formula of the 1894 statute in our rules of court adopted in 1948. *R.* 1:2–19(a). In 1949 we added to that rule that "The court may, however, notice plain errors affecting substantial rights of the defendant, although they were not brought to the attention of the trial court." The rule was continued in that amended form in our revision of 1953 as *R. R.* 1:5–1(a).

The "plain error" prescription of course did not define a "substantial right" or the "affect" thereon which would require a new trial. As we have said, we attempted a definition in *Corby, supra,* 28 *N. J.* at 108, describing plain error as a "legal impropriety affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." But the phrase "a clear capacity to bring about an unjust result" still spoke of some ungraded, and ungradable, degree of possibility, for it did not require a finding that the error did, or probably did, lead to an unjust result.

Finally, in the revision of 1969 we adopted *R.* 2:10–2 which reads:

"Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result, but the appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial or appellate court."

Thus "harmful" error is now cast in identical terms with *Corby's* exposition of "plain error." This does not mean that the reviewing court may not, as theretofore, decline to accept an issue first raised on appeal, or that the reviewing court may not find the failure to object was a recognition by counsel that the alleged error in fact was of no moment or was a tactical decision to let the error go uncorrected at the trial. But the same ultimate standard applies whether the error was objected to below or whether the error was

first claimed upon appeal if the reviewing court in its discretion decides to consider the belated claim. The use with respect to "harmless error" of the same formula we had stated for "plain error" was simply an acknowledgment that after all was said, the question for the appellate court was simply whether in all the circumstances there was a reasonable doubt as to whether the error denied a fair trial and a fair decision on the merits, and that upon that question the reviewing judge was inevitably remitted to his own conscientious judgment.

On the federal scene, *Fed. R. Crim. P.* 52(a) provides that error is harmless if it "does not affect substantial rights." As noted above, we used the same terms as a component in our rule prior to the 1969 revision. That test of course does not reveal the degree of possibility of harm which will require a new trial. The Federal Supreme Court has dealt specially with "constitutional" errors, choosing to do so by opinion rather than by rule.

As to "constitutional" errors, some may go so plainly to the integrity of the proceedings that a new trial is mandated without more. When this is true, a new trial is the just course because of the nature of the right infringed and its evident impact upon the fairness of the trial, rather than because the right happens to be embedded in the Constitution and is thus secured from legislative abolition. Equally clear must be the proposition that not every "constitutional" error can sensibly call for a new trial. Especially is this true today, for in response to pressures upon it, the Supreme Court has found to be constitutionally required sundry rights theretofore dealt with by the State courts at a level below that of constitutional compulsion. It is not surprising therefore that the Supreme Court has said that an error may indeed be harmless despite its constitutional hue.

In *Fahy v. Connecticut,* 375 *U. S.* 85, 86–87, 84 *S. Ct.* 229, 230, 11 *L. Ed.* 2d 171, 173 (1963), which involved the use of illegally seized evidence, the Court said:

"The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."

The reviewing judge thus remains obliged to deal in terms of a possibility of harm, described only as "reasonable," a word which inevitably imports a subjective, individual assessment of the myriad circumstances of each case. *Fahy* did not spell out how this standard departs from the concept of *Fed. R. Crim. P.* 52(a), *i. e.,* that an error is harmless if it "does not affect substantial rights."

In *Chapman* the Court rejected the proposition that every constitutional error must lead to a new trial, saying (386 *U. S.* at 21–22, 87 *S. Ct.* at 827; 17 *L. Ed.* 2d at 709) :

"We are urged by petitioners to hold that all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful. Such a holding, as petitioners correctly point out, would require an automatic reversal of their convictions and make further discussion unnecessary. We decline to adopt any such rule. All 50 States have harmless-error statutes or rules, and the United States long ago through its Congress established for its courts the rule that judgments shall not be reversed for 'errors or defects which do not affect the substantial rights of the parties.' 28 U. S. C. § 2111. None of these rules on its face distinguishes between federal constitutional errors and errors of state law or federal statutes and rules. All of these rules, state or federal, serve a very useful purpose insofar as they block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial. We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction."

After speaking of California's exposition of harmless error in that case, the Supreme Court stated a "preference" for its own, saying (386 *U. S. at* 23–24, 87 *S. Ct.* at 827–828, 17 *L. Ed.* 2d at 710) :

"* * * We prefer the approach of this Court in deciding what was harmless error in our recent case of Fahy v. State of Connecticut, 375 U. S. 85, 84 S. Ct. 229, 11 L. Ed. 2d 171. There we said: 'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' * * * Al-

though our prior cases have indicated that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error, this statement in *Fahy* itself belies any belief that all trial errors which violate the Constitution automatically call for reversal. * * * There is little, if any, difference between our statement in Fahy v. State of Connecticut about 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our *Fahy* case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. * * *"

It seems to us that *Chapman*, like *Fahy*, offers no real guidance as to the degree of "possibility" which will require a new trial. As *Chapman* itself says, it intended no more than a restatement of *Fahy* when it required a finding "beyond a reasonable doubt" that the error did not contribute to the verdict. The "reasonable doubt" of *Chapman* is no more concrete than the "reasonable possibility" of *Fahy*. A "reasonable doubt," by its historic definition in the area of fact-finding, does not mean any conceivable doubt, and it can mean nothing else here.

Stated affirmatively, the proposition is that a new trial shall be ordered if there is a reasonable doubt as to whether the constitutional error contributed to the verdict. It seems to us that this ts the way judges have always approached the subject of "harmless" error, whatever the verbal framework within which the subject has been cast. A judge would hardly insist an error, "constitutional" or other, was "harmless" if he found a "reasonable" doubt as to whether the error contributed to the result. What continues to defy articulation is the process which leads a judge to say there is a doubt and that the doubt is or is not a reasonable one. The circumstances are too infinite and the appellate judgment too laden with discretion to admit of formulary aid. It therefore is not surprising that, hard upon *Chapman*, the dissenters in *Harrington v. California*, 395 *U. S.* 250, 89 *S. Ct.* 1726, 23 *L. Ed.* 2d

284 (1969), proclaimed that the majority there laid the *Chapman* formula to rest.

Although we doubt that our conception of harmless error differs at all from *Chapman* and *Fahy*, those cases of course are binding upon the State courts with respect to claims of "constitutional" errors which are raised timely pursuant to State practice, and hence their statement of the standard should be used for whatever light it may shed in a case at hand. As to an untimely claim of error, although our courts remain free to decide whether to accept the issue as we have already said, nonetheless it is well, in the interest of minimizing discordant results on federal habeas corpus, to speak in terms of the *Fahy-Chapman* test, once the decision is made to accept the issue. This is not to say, however, that, in deciding whether the error was in fact harmless, the court should ignore the circumstance that the failure to object may suggest the error was of no moment in the actual setting of the trial. But in deciding whether upon all the circumstances the error calls for a new trial, our judges should look to the *Fahy-Chapman* formula for whatever help they may find in it.

## II

The remaining question relates to the sentence. The authorized maximum jail term is ten years. *N. J. S. A.* 2A:113-5. The sentence imposed was seven to ten years.

█ The question is troublesome. We do not doubt defendant's guilt of the crime of manslaughter. And there is the aggravating circumstance that defendant carried a concealed weapon illegally. Yet there is no suggestion he had the weapon for any criminal end. He is a carpentry contractor and claims to have carried the gun to protect his payroll, modest though it was. Carrying the gun was really his undoing, for the gun was too handy. The presentence report indicates defendant is a good family man. His offense is quite out of character. All in all, we think the statutory maximum is too heavy. The sentence should be reduced, and

the sentence should give the parole authority a wider discretion in the interest of defendant's rehabilitation. The term is reduced to two to seven years, and as thus modified, the judgment is affirmed.

*For reversal*—None.