**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5387-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DARRYL D. TOWNSEND,
a/k/a D-BLOCK, and
ANDREW DEEN,

     Defendant-Appellant.

_____

Submitted August 10, 2020 – Decided August 28, 2020

Before Judges Moynihan and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 17-02-0261.

Joseph E. Krakora, Public Defender, attorney for appellant (John Walter Douard, Assistant Deputy Public Defender, of counsel and on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Adam David Klein, Deputy Attorney General, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

After a jury found him guilty of all crimes for which he was indicted, defendant appeals from his convictions and concomitant aggregate sixty-year sentence for first-degree murder,[1] N.J.S.A. 2C:11-3(a)(1) and (2) (count one); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count two); and fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (count three), in connection with the stabbing death of Tyree Kirkpatrick. In his merits brief, he argues:

POINT I

THE PREJUDICIAL ADMISSION OF DEFENDANT'S RECORDED JAIL CALLS INTERJECTED IMPERMISSIBLE OTHER CRIME/BAD ACTS EVIDENCE.

POINT II

PERMITTING THE JURY TO VIEW THE PORTION OF THE BODYCAM VIDEO IN WHICH THE POLICE QUESTION [THE DAUGHTER OF KIRKPATRICK'S GIRLFRIEND], WHO DID NOT TESTIFY, ABOUT THE KNIFE VIOLATED TOWNSEND'S CONSTITUTIONAL RIGHT TO CONFRONT THE WITNESSES AGAINST HIM.

---

[1] After merging count two into count one, the judge imposed a sixty-year prison term on count one, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, and a concurrent eighteen-month term on count three.

POINT III

THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ISSUING AN INSTRUCTION ON FLIGHT AS CONSCIOUSNESS OF GUILT, WITHOUT INFORMING THE JURY OF [DEFENDANT'S] REASON FOR ATTEMPTING TO LEAVE THE HOUSE.

POINT IV

[DEFENDANT'S] 60-YEAR PRISON TERM WAS MANIFESTY EXCESSIVE.

In his pro se supplemental brief, he adds:

POINT I

THE TRIAL COURT ERRED IN VIOLATION OF DEFENDANT'S DUE PROCESS RIGHTS.

POINT II

THE TRIAL COURT ERRED IN ALLOWING THE STATE TO PROCEED IN THE USE OF TAINTED EVIDENCE THAT WAS GIVEN APPROXIMATELY ONE MONTH AFTER ARREST THUS VIOLATING DEFENDANT'S SIXTH AMENDMENT RIGHT TO A FAIR TRIAL AND DUE PROCESS.

Unpersuaded, we affirm.

According to the trial evidence, Kirkpatrick was the boyfriend of Nakeama Nokes, who had called police to her residence regarding a family dispute. While police were discussing that issue with Nokes, Kirkpatrick

entered the home and proceeded to the second floor where defendant, Nokes's former boyfriend, was asleep in Nokes's bedroom. After Nokes called defendant's name, she proceeded to the second floor. Her fourteen-year-old son was also present; contrary to his prior account to police, he testified he saw defendant stab Kirkpatrick.

In the commotion that followed, Kirkpatrick is captured on police body-worn camera (bodycam) footage saying, "[h]e just stabbed me. I don't know." While Camden County Police Officer Michael Herring summoned medical assistance, he saw defendant climbing out of the second-floor window and ordered him back inside. Defendant then ran down the stairs toward the first floor, claiming there was a gunman upstairs. Defendant was taken into custody. While in jail, he placed two telephone calls which were recorded.

During the police investigation immediately following the stabbing, police questioned Nokes's daughter. That colloquy, like all other police activity, was captured on bodycams. Police also seized two knives. The State, however, later ruled out both those knives as the murder weapon. Instead, the State contended the murder weapon was a bloody pocketknife found behind Nokes's bed the next month by Nokes's son, which Nokes later turned over to police.

DNA analysis determined the blood on that knife belonged to Kirkpatrick, but no forensic evidence linked the knife to defendant.

Defendant first challenges the admission at trial of the recorded telephone calls between defendant and two women while he was in jail and the recorded bodycam footage. "Traditional rules of appellate review require substantial deference to a trial court's evidentiary rulings." State v. Morton, 155 N.J. 383, 453 (1998). The trial judge's rulings will be upheld "absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment." State v. Perry, 225 N.J. 222, 233 (2016) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). "An appellate court applying this standard should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling "was so wide of the mark that a manifest denial of justice resulted."'" Ibid. (quoting State v. Marrero, 148 N.J. 469, 484 (1997)); see also State v. Fortin, 189 N.J. 579, 597 (2007). Even if there is an abuse of discretion, we "must then determine whether any error found is harmless or requires reversal." State v. Prall, 231 N.J. 567, 581 (2018).

In his merits brief, although he concedes their relevance, defendant argues the telephone calls should have been excluded from evidence because they were "not probative of the State's case that [defendant] murdered Kirkpatrick." He

also claims the "calls contained statements by [defendant] that were far more prejudicial than probative and did not constitute admissions that contributed significantly to the State's case."

Defendant made a similar argument to the trial judge, but when asked to clarify his argument, he sought to exclude as prejudicial "information about [defendant's] previous incarceration . . . mentioned in those calls [and his] reference [to items he wished removed from his residence] which . . . may be indicative of other crimes." The State agreed to redact those items.

The trial judge found the recorded conversations were properly obtained by the State and were admissible as statements of a party-opponent under N.J.R.E. 803(b)(1).[2] She noted that defendant, in both calls, "clearly . . . is talking about the incident at the [crime-scene residence] at the time that . . . Kirkpatrick met his death," making the calls relevant to the murder. The record supports the judge's conclusion.

Contrary to defendant's present contention that he "made no unambiguous admissions that would support the State's case," defendant's account to the first

---

[2] Defendant does not challenge the warrant by which the recorded calls were obtained or the judge's determination that the calls were admissible under N.J.R.E. 803(b)(1).

unidentified female[3] related only that Kirkpatrick verbally made demands and possible threats. He also told the first female, "well, good thing it wasn't the other way around and he got me."

He also described the confrontation after Kirkpatrick entered the room:

> I got my shit right there, [and Kirkpatrick said] you ain't going nowhere until you answer all – he said just tell me that that's still your bitch and all – I said, that ain't my bitch. I said I ain't got no bitch. I said, man, I go home to my baby mom every night. I don't give a fuck about her, bro. And he got mad. He said just tell me right now, I'll leave, I'll leave. I said you don't got to leave, I'm ready to leave, bro. And then he whipped on me and told me I ain't going no fucking where.
>
> . . . .
>
> Ain't going nowhere until I answer all (inaudible) and then give him my cell phone.

Although defendant's claim that Kirkpatrick "whipped" on him supported defendant's self-defense theory, other portions of his conversation with the first female refuted that theory:

> [UNIDENTIFIED FEMALE]: Oh. So you all wasn't supposed – supposed to – (inaudible) him. I[t] was supposed to be just a fight.
>
> [DEFENDANT]: What fight? That [n*****] ain't want – man.

---

[3] The first female was identified by the State as defendant's daughter's mother.

A-5387-17T4

> [UNIDENTIFIED FEMALE]: And then Mya is going to say he was whooping your ass and that's why you pulled out your knife.
>
> [DEFENDANT]: He was – if he was whooping my ass, I wouldn't have had time to do all that.

Defendant also told the female he was asleep in the second-floor bedroom when Kirkpatrick entered the room and confronted defendant, disavowing third-party accounts that Kirkpatrick punched defendant out of his sleep, saying Kirkpatrick woke him by tapping defendant's leg. He also told the second female that he was awakened by a tap.

Defendant also told the second female about the family dispute between Nokes and her daughter that led to his presence at their residence, and then related that Kirkpatrick came in and

> pulled out on me, talking about some – what I'm doing there and this and I better answer all of them and before I leave from there I better give him my phone[] and all this shit and up. I told him, bro, you got to be fucked up. I told him (inaudible) – ma, I swear to God, I told this [n *****] like six times, bro, I don't want her, I don't care about her, just go ahead get out of my face. That [n *****] whipped out on me, told me I ain't going no fucking where until I answer his questions and this and that. And one thing led to another, we got into a little scuffle and that's what happened. Like, fuck. It ain't like I did it on purpose or something.

He later continued that when he was roused, Kirkpatrick was "in [defendant's] face" demanding that defendant tell him

> what I want to hear and give me your phone before – I told him, bro, you got [to] be fucked up, bro. What the fuck you mean?  He talking about, [n*****], we can take it there, I'll bang this, and I do that, and I know where you from and – come on, man, now you threatening me.  And I told him like five times, I said, bro, I don't want to argue with you, bro, just watch out and let me leave.  The [n*****] flashed on me and told me sit the fuck down, I ain't going nowhere until he – he get what I want and all – (inaudible) you wild.  And he said, that's your bitch still.  I said, no, it used to be my bitch.  That ain't my bitch no more, you could have her, she don't want me.  I told that bitch – I told that [n*****] that four times, that ain't my bitch.  I got a bitch.  That ain't my bitch.  He was the one mad.  So for all I know, she could have got him.  When that mother fucker was in the hallway.  That's where all the shit was at once I woke up, in the hallway (inaudible).  How the fuck do I know you ain't do it and just trying to blame me for the fall guy.  So I don't give a fuck.

Relevant evidence is "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action[,]" and is admissible.  N.J.R.E. 401; N.J.R.E. 402; see also State v. Castagna, 400 N.J. Super. 164, 174 (App. Div. 2008).  The evidence must be probative of a fact that is "really in issue in the case[,]" as determined by reference to the applicable substantive law.  State v. Buckley, 216 N.J. 249, 261 (2013) (quoting State v. Hutchins, 241 N.J. Super. 353, 359 (App. Div. 1990)).

9

We see no abuse of discretion in the trial judge's balance of the probative and prejudicial values of the calls. Parts of the calls supported defendant's self-defense and third-party guilt defenses. Other parts supported the State's claim of purposeful and knowing murder and refuted defendant's defenses. See State v. Scherzer, 301 N.J. Super. 363, 469 (App. Div.1997) (noting that "[a]ll damaging evidence is prejudicial; it is only when the probative value is substantially outweighed by the potential prejudice that the evidence should be excluded.").

We agree with defendant that those portions of the calls referencing anonymous allegations that he broke into the crime-scene residence should have been redacted. But, defendant did not object to those portions of the calls. Moreover, the jury heard evidence that effectively countered the unsupported suppositions related by the females to defendant, who vehemently denied the burglary accusations: defendant was asleep in the upstairs bedroom when Nokes, in the presence of police, called defendant by name when Kirkpatrick entered the home, making no mention to the police of an illegal entry by defendant. As such, we determine the admission of that evidence was not "of such a nature as to have been clearly capable of producing an unjust result[.]" R. 2:10-2. "The mere possibility of an unjust result is not enough" to find plain

error.  State v. Funderburg, 225 N.J. 66, 79 (2016).  The possibility of an unjust result must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached[.]"  State v. Melvin, 65 N.J. 1, 18-19 (1974); see also State v. Macon, 57 N.J. 325, 335 (1971) ("No matter how a test may be stated, the question whether an error is reason for reversal depends finally upon some degree of possibility that it led to an unjust verdict.").

That plain error standard also guides our review of defendant's claim that defendant's right to confront adverse witnesses was violated by the admission of bodycam footage showing an exchange between Nokes's daughter—who did not testify at trial—and a police officer after she identified Kirkpatrick as her mother's new boyfriend and defendant as her ex-boyfriend:

> [POLICE OFFICER]:  Okay. So you don't know why he was in the house today?
>
> [UNIDENTIFIED FEMALE]: [4]  No.
>
> [POLICE OFFICER]:  He wasn't – he wasn't here when you was here earlier?
>
> [UNIDENTIFIED FEMALE]:  Yeah.  When I had woke up, I found him in bed.

---

[4]  The record does not reveal the "unidentified" speaker's name.  Both the State and defendant identify the speaker as Nokes's daughter in their merits briefs.

[POLICE OFFICER]: Okay. So how – and he was still in the house after you left? You don't know how he got in the house?

[UNIDENTIFIED FEMALE]: No.

[POLICE OFFICER]: No. And do you know what knife he used?

[UNIDENTIFIED FEMALE]: He had a – he always had a pocket knife with him. A real big pocket knife.

[POLICE OFFICER]: You don't know what knife he used to stab the victim?

[UNIDENTIFIED SPEAKER]: (Inaudible) saw him stab in the neck. (Inaudible).

The United States Supreme Court, in Davis v. Washington, 547 U.S. 813, 822 (2006) (footnote omitted), distinguished between the two types of statements:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Unlike the State, we think the law is sufficiently settled that Nokes's daughter's statements to the police were testimonial. "[T]he Confrontation Clause of the

12

United States Constitution bars the 'admission of testimonial statements of a witness who did not appear at trial unless he [or she] was unavailable to testify, and the defendant had a prior opportunity for cross-examination.'" State v. Slaughter, 219 N.J. 104, 116-17 (2014) (quoting Crawford v. Washington, 541 U.S. 36, 53-54 (2004)). The law applies no matter the means used to convey the testimonial statement; we see no difference between a statement recorded on bodycam or any other conventional means.

Nokes's daughter answered the officer's questions after the stabbing and defendant's arrest. See State v. Basil, 202 N.J. 570, 597-99 (2010) (concluding there was no ongoing threat posed by a defendant who no longer possessed a weapon and who was under police control). There was no ongoing emergency and no threat. Medical units had arrived to assist Kirkpatrick, and police had begun to secure the scene and identify evidence.

Moreover, the questions posed by the officer, asking about the murder weapon, was clearly relevant to proofs necessary for defendant's prosecution. At that point, the police had identified two kitchen knives. Only after the pocketknife was mentioned did the officer tell other officers to look upstairs in the residence for a pocketknife. Although one was not immediately found, Nokes's son later found the bloody pocketknife behind the bed in the bedroom;

13

the knife did not contain any evidence relating it to defendant. The State presented the pocketknife at trial as the murder weapon.

Nonetheless, we first note that defendant voiced no objection to the presentation of that portion of the bodycam footage to the jury; indeed, he actively sought its admission. The State's proffer relating to the bodycam footage was limited to that portion recorded before 5:20 a.m. Defendant, however, told the trial judge, "[w]e do want to see more . . . could I carry it forward?" After a substantial portion of the bodycam footage was played, defense counsel told the judge:[5]

> If this is ruled admissible, there's a portion later on which relates to officers entering the upstairs and searching. In other words, there's additional video of them walking through and – and observing upstairs. It would be an element that I would introduce at trial, but given that you've now had an opportunity to see a significant portion of the substance of the tape, if I would be okay in using the entirety of the tape during my defense, then I don't know that there's more value or evaluative value to be had by watching the next [thirty] to [forty] minutes of the – of the video.

The judge responded, "I just want to see it because . . . if you want to use all of it, . . . I have to see what I think is relevant [and] not relevant." The colloquy

---

[5] The transcript notes the State told the court at 11:15 a.m. it did not intend to introduce any other footage. The footage was stopped at 11:28 a.m. when defendant requested to use the entire bodycam footage.

between the officer and Nokes's daughter was played just before the footage was paused in court at 11:37 a.m. The video footage was thereafter played to conclusion.

During argument, when asked his position with regard to the bodycam footage, defense counsel told the trial judge had the assistant prosecutor "not played it, I would have played it. So . . . my position as to the body worn cam is that it be available for defense use, along with [p]rosecution use, obviously, as an element for the trial." The trial judge then asked, "[s]o you have no objection to the body worn cam coming in its entirety?" Defense counsel responded, "[c]orrect. And, in fact . . . if the [c]ourt remembers, I actually asked for an extended portion of it to be played after we . . . observed an early portion of it because I felt that it was demonstrative of various elements, which . . . I would want to bring up at trial."

In ruling on the admissibility of the bodycam footage, the trial judge stated, "both sides have no objection to the body camera footage coming in." Only the State requested redactions. At sentencing, the trial judge confirmed "[t]he video from the cameras was played for the jury by agreement of the parties with appropriate redactions."

The hearsay statements of Nokes's daughter should not have been introduced, but defendant not only acquiesced to that now-claimed "error," he invited it. Generally, under the invited-error doctrine, such choices cannot be appealed. State v. A.R., 213 N.J. 542, 561 (2013). "[I]f a party has 'invited' the error, he [or she] is barred from raising an objection for the first time on appeal." Ibid. The doctrine bars trial errors that defendant "induced, encouraged or acquiesced in or consented to" as grounds for reversal. State v. Munafo, 222 N.J. 480, 487 (2015) (quoting A.R., 213 N.J. at 561). "The invited-error doctrine is intended to 'prevent defendants from manipulating the system' and will apply 'when a defendant in some way has led the court into error' while pursuing a tactical advantage that does not work as planned." State v. Williams, 219 N.J. 89, 100 (2014) (quoting A.R., 213 N.J. at 561-62).

Defense counsel argued to the trial judge that his third-party guilt defense was buttressed by the bodycam footage. He also used the bodycam footage to illustrate that the police searched the area where the pocketknife was said to have been found and did not find that knife. He also referenced the bodycam footage showing: defendant's arrest, arguing defendant was not bloody despite the copious amounts of blood at the crime scene; Nokes's daughter, claiming Nokes's son was also in the bedroom "at least for a short period of time and was

engaged in some sort of an altercation as well that led him to run in and call his sister"; and Nokes talking to police, "allowing" Kirkpatrick to enter the residence and then calling defendant's name, arguing Nokes "put the two of them in the same place at the same time." Buttressing his third-party-guilt argument, he continued:

> Later on, after [defendant] attempts to escape out a window and then attempts to run down the stairs, Miss Nokes is seen on the video. And it's stunning to have this video. I mean, the idea that you have the video of a murder scene is – I mean, you're a very unique – a uniquely positioned jury to actually have that picture into this scene. You see how distraught this woman is. You see how disheveled this woman is. You see the state of her hair. You see the fact that she's covered in blood. You get to see the aftermath in the two rooms, the hallway and the bathroom, that look like – they look like a Chicago slaughter house. I mean, the blood is in the bedroom as well because we saw the pictures with the combs.
>
> The CSI aspect of it. I told you when we were done it would be confusing and I still think four people with one dead leaves three to ponder as to who – who might have done this. Who might have done this in your minds beyond a reasonable doubt.

Obviously, the defense consented for strategic reasons to the admission of all bodycam footage. As such, we see no reason to disturb the jury's verdict. See State v. Marshall, 123 N.J. 1, 93 (1991) ("[E]xcept in the most extreme cases, strategic decisions made by defense counsel will not present grounds for

17

reversal on appeal[.]").  We discern "no fundamental injustice that would warrant relaxing the invited error doctrine."  See N.J. Div. of Youth & Family Services v. M.C. III, 201 N.J. 328, 342 (2010).

Further, defendant did not raise a Confrontation Clause issue, which, "like other constitutional rights, may be waived by the accused."  Williams, 219 N.J. at 98.  In Williams, the court observed that defendant waived his constitutional right when he raised no objection to testimony about an autopsy report by a substitute medical examiner who had not completed the postmortem procedure, id. at 93, holding a "defendant always has the burden of raising his [or her] Confrontation Clause objection," id. at 99 (quoting Melendez-Diaz v. Massachusetts, 557 U.S. 305, 327 (2009)).  "It is the defendant's choice 'to assert (or forfeit by silence) his Confrontation Clause right.'"  Ibid. (quoting Melendez-Diaz, 557 U.S. at 326).

Nor do we perceive that the admission of the colloquy between the officer and Nokes's daughter was plain error.  Nokes's son's testimony that he saw defendant stab Kirkpatrick, defendant's admissions during the intercepted jail calls and the evidence of his flight render remote the possibility that the bodycam evidence led to an unjust verdict.  Macon, 57 N.J. at 335.  In light of the discovery of the pocketknife, albeit well after the murder, and the finding of

18

Kirkpatrick's blood on that knife, Nokes's daughter's statements linking defendant to a pocketknife was not "of such a nature as to have been clearly capable of producing an unjust result[.]" R. 2:10-2.

We see no merit in the remainder of defendant's arguments on this issue—including: (1) the admission of the officer's belief that defendant stabbed Kirkpatrick, as expressed in his questions, was error; and (2) the fact that the jury requested to watch the bodycam video, including the colloquy in issue, evidenced the importance of that inadmissible evidence—to be without sufficient merit to warrant discussion. R. 2:11-3(e)(2). We note the officer did not testify, and the beliefs embedded in the questions were not expert or lay testimony that defendant was guilty. The officer's questioning took place right after the stabbing while the investigation was still fresh; it was obvious his theory of the case, at least that used in questioning Nokes's daughter, was based on the then-current evidence that linked only defendant to the murder.

Defendant urges us to reverse and remand for a new trial because the trial judge did not include that portion of the model jury charge on flight explaining his reason for flight: he "was terrified that Kirkpatrick had a gun[.]" See Model Jury Charges (Criminal), "Flight" (rev. May 10, 2010). The Model Charge instructs the omitted portion of the instruction "SHOULD BE USED WHERE

THE DEFENSE HAS NOT DENIED THAT HE/SHE DEPARTED THE SCENE BUT HAS SUGGESTED AN EXPLANATION." Ibid. The pertinent section provides: "There has been some testimony in the case from which you may infer that the defendant fled shortly after the alleged commission of the crime. The defense has suggested the following explanation[.]" Ibid.

Defendant, however, never suggested an explanation. During the charge conference, defendant objected only to the inclusion of the flight charge because "[t]he idea that he was engaged in some sort of a flight that has anything to do with him getting away from what was the scene of danger is not supported by the evidence presented."

The trial judge disagreed, reviewing the evidence pertinent to both defendant's attempts to leave the crime scene. In his first attempt, captured on Officer Herring's bodycam, defendant was climbing out the second-floor window turning "as if he [were] trying to jump down," when Officer Herring drew his service weapon and ordered defendant back inside; defendant said, "oh shit," and complied. The judge also recounted Officer Herring's testimony and bodycam footage showing that, after he was ordered inside, defendant quickly ran down the stairs from the second floor with his hands up claiming: "He's in here. He's in there. He['s] in there," thrice saying, "He got a gun."

Defendant does not contend it was error to give the flight charge. He now argues the trial judge should have recognized that defendant was trying to "get away from the bedroom where he believed somebody had a gun. He was not trying to escape from the police." He concedes in his merits brief that defense counsel failed to object to the omission of the explanation section, thus requiring us to review the charge under the plain error standard.

We recognize "'[a]ppropriate and proper charges to a jury are essential to a fair trial.' And proper explanation of the elements of a crime is especially crucial to the satisfaction of a criminal defendant's due process rights." State v. Burgess, 154 N.J. 181, 185 (1998) (quoting State v. Green, 86 N.J. 281, 287 (1981)).

> It is the independent duty of the court to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party. Finally, "[a]s an indication of the paramount importance of accurate jury instructions, we have held that erroneous instructions on material issues are presumed to be reversible error."
>
> [State v. Reddish, 181 N.J. 553, 613 (2004) (alteration in original) (citation omitted) (quoting State v. Marshall, 173 N.J. 343, 359 (2002) (Marshall IV)).]

The judge's flight instruction mirrored the Model Charge, according it a presumption of correctness. See State v. R.B., 183 N.J. 308, 325 (2005) (stating

trial court's obligation to deliver model charges); <u>Mogull v. CB Comm. Real Estate Grp., Inc.</u>, 162 N.J. 449, 466 (2000) (noting "[i]t is difficult to find that a charge that follows the Model Charge so closely constitutes plain error"). The instruction followed the defense theory that he denied any attempt to flee, and allowed the jury to assess whether defendant was merely departing the scene or fleeing to avoid accusation or arrest for the charged crimes.

As to the omitted portion of the Model Charge, defendant failed to offer an explanation for his flight at any juncture during the trial. Instead, disregarding defendant's attempt to exit through the window, defense counsel argued during the charge conference defendant's actions did not constitute flight:

> There's a scuffle in the bedroom and he's looking to head out the bedroom door. He comes down the steps instead and says that he's observed a gun. At no time did he resist the arrest when he was being arrested. At no time did he make some attempt that was credible at sort of escaping. The idea is at all times he was aware the police were there. His testimony provided through phone calls and through other means, other people's testimony shows that he was present while the police were there. They were there at all times during this case. He's certainly aware of that.

At no time during the trial did defendant proffer that he was fleeing from a gunman. Indeed, as defendant admits in his merits brief, no gun was ever recovered from the crime scene or from any person related to the incident.

Moreover, defendant attempted to climb out of the window after the stabbing, and he voiced no concern to Herring at that time about a gunman, exclaiming about the gunman only after his attempt to leave through the window was thwarted.

Inasmuch as the jury instruction tracked the defense theory about defendant's attempts to leave the second-floor crime scene, we discern no "legal impropriety . . . prejudicially affecting the substantial rights of the defendant and sufficiently grievous to . . . convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Hock, 54 N.J. 526, 538 (1969). There was no error, much less plain error, in the judge's flight instruction.

Defendant avers the trial judge failed to find mitigating factors three ("defendant acted under strong provocation"), N.J.S.A. 2C: 44-1(b)(3), and five (the victim's conduct induced or facilitated the commission of the crime), N.J.S.A. 2C:44-1(b)(5), because there was evidence that defendant, Nokes's former boyfriend, was awakened from sleep in Nokes's bed and threatened by Kirkpatrick, her then-current boyfriend, and that defendant "was induced or set up to engage in a fight that had a high likelihood of turning violent" by Nokes.

23

Defendant adds the judge "provided no reasons" for imposition of the sixty-year prison term, thirty years more than the minimum term.

The trial judge found and gave great weight to aggravating factor three (the risk that defendant would commit another crime), N.J.S.A. 2C:44-1(a)(3); aggravating factor six (the extent of defendant's criminal history and seriousness of the offenses which he was previously convicted), N.J.S.A. 2C:44-1(a)(6); and aggravating factor nine (the need to deter defendant and other individuals from violating the law), N.J.S.A. 2C:44-1(a)(9). Finding no mitigating factors under N.J.S.A. 2C:44-1(b) applied, the judge found "the aggravating factors clearly and convincingly substantially outweigh[ed] the lack of mitigating factors."

The judge rejected defendant's contention that he was strongly provoked, finding no evidence of provocation. She also recognized the jury's rejection of defendant's self-defense theory and found inapplicable mitigating factor five.

"[A]n appellate court should not second-guess a trial court's finding of sufficient facts to support an aggravating or mitigating factor if that finding is supported by substantial evidence in the record." State v. O'Donnell, 117 N.J. 210, 216 (1989). Under our deferential standard of review, we "must not substitute [our] judgment for that of the sentencing court," State v. Fuentes, 217 N.J. 57, 70 (2014), and will affirm a sentence unless:

(1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

[Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Under that lens, we discern no reason to overturn the trial court's sentence. The judge carefully delineated the reasons for finding all three aggravating factors and the weight she accorded each in her comprehensive oral sentencing decision, and those reasons are supported by "competent credible evidence in the record." State v. Miller, 205 N.J. 109, 127 (2011) (quoting State v. Bieniek, 200 N.J. 601, 608 (2010)).

We also agree that there is no evidence that Nokes, who was in the midst of a police-involved custody dispute when Kirkpatrick entered the home, sent Kirkpatrick to her room where defendant was sleeping, much less that she intended violence, or even mischief. We also see no evidence that defendant acted under strong provocation to inflict Kirkpatrick's stab wounds. Defendant was unharmed and, in the intercepted jail call to the first female, said nothing of any physical confrontation or threat initiated by Kirkpatrick; in fact, when told that someone said Kirkpatrick was "whooping [defendant's] ass and that's why

25

[defendant] pulled out [his] knife," defendant replied, "if he was whooping my ass, I wouldn't have had time to do all that." And when told that someone said defendant was sleeping and Kirkpatrick "punched [him] out of [his] sleep," defendant replied "[h]e didn't punch me out of my . . . sleep. He woke me up." He said Kirkpatrick only "tapped" his leg to wake him. He, likewise, told the second female during the other jail call that Kirkpatrick asked what he was doing there and demanded his phones, mentioning nothing about any physical provocation by Kirkpatrick. He told the second female the two "got into a little scuffle," and that "it ain't like [he] did it on purpose or something." He later told her Kirkpatrick had made verbal threats to which defendant, in his own words, told Kirkpatrick, "I don't want to <u>argue</u> with you" (emphasis added), but described no provocation to justify the stabbing.

We see no reason to disturb the sentence imposed.

We determine the arguments made by defendant in his pro se brief are without sufficient merit to warrant discussion. <u>R.</u> 2:11-3(e)(2). Defendant's challenge to the grand jury presentment was never made to the trial judge and there was sufficient evidence justifying the admission of the pocketknife, including the testimony of Nokes's son who said he found the knife at the crime scene and the DNA evidence linking the knife to the victim.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-5387-17T4